UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW NOLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA THOMAS, Warden, | ) | |
| JANET PURDUE, Assistant Warden, | ) | |
| JAMES HENRY, Assistant Warden, | ) | No. 11 C 1565 |
| ANTONIO SALAS, Captain, | ) | |
| WILLIAM SCHNAKE, Unit Manager, | ) | Judge Zagel |
| MICHAEL REUSCH, Lieutenant, | ) | |
| WANDA COLLINS, Lieutenant, | ) | |
| KIM SHIVERS, Correctional Officer, | ) | |
| ROBERT JOHNSON, BOP Staff, | ) | |
| MICHAEL NALLEY, BOP Regional | ) | |
| Director, | ) | |
| | ) | |
| Defendants. | | |

**DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

**Introduction**

Plaintiff Matthew Nolan, a former federal prisoner, commenced this civil action against ten

employees of the United States Bureau of Prisons, complaining about the conditions under which

he had been confined at the Chicago MCC. The action is an individual-capacity *Bivens*[1] lawsuit,

in which Nolan seeks damages personally from the named federal officers and managers.

Defendants are entitled to qualified immunity because the complaint does not allege a violation of

clearly established law nor sufficient personal involvement of the named defendants. Thus, the

complaint should be dismissed.

---

[1] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

**Facts**

## I.    Nolan's Imprisonment and Plea

Nolan arrived at the MCC on February 26, 2009, detained on an international warrant issued by the government of Costa Rica that sought Nolan's extradition on charges of murder, aggravated kidnaping, and use of a false document. Complaint, ¶¶ 14-15. Nolan was placed in administrative detention in the MCC special housing unit for security reasons, partly[2] because Nolan had served in a "specialized regiment within the British Army with unique military training and skills." Ex. 1 (Grievance Responses). On March 10, 2009 — within just two weeks of his arrival at the MCC — a search of Nolan's cell revealed a variety of contraband designed to facilitate an escape. *Id.*; Ex. 3 (Plea Agreement). This included a harness and 31 feet of rope braided from bedding material, which Nolan had concealed in his mattress, a metal clip capable of opening handcuffs, and a razor blade, which Nolan kept in a bar of soap. *Id.* The MCC continued Nolan in administrative detention, and Nolan was eventually indicted for violations of 18 U.S.C. § 1791(a)(2) (possession of prohibited object) and § 1519 (obstruction of justice). Ex. 2 (Indictment). In April 2010, Nolan pled guilty and acknowledged in the plea agreement that he had concealed the above items to facilitate an escape. Ex. 3 (Plea Agreement). Nolan further admitted that in February and March 2009, he communicated multiple times with "Individual B" about escaping from the MCC, using coded language to discuss the escape. Nolan also acknowledged that in March 2009, while awaiting extradition to Costa Rica, he placed a phone call to "Individual A," during which he discussed the FBI's interest in a safe located in Nolan's residence. Nolan, using coded language, directed

---

[2] The supplemental material that we provide with this motion is limited to grievance documents referenced in the complaint and court documents of which the court can take judicial notice.

Individual A to destroy or otherwise conceal the contents of the safe in order to prevent law enforcement from discovering its contents. *Id.* On July 7, 2010, Nolan was sentenced to fourteen months imprisonment. He had been detained at the MCC since March 2009, and was given credit for this time, which satisfied his criminal sentence.

Nolan remained in custody on the Costa Rican charges. On August 31, 2009, a magistrate judge issued a memorandum opinion finding a lack of probable cause on the charges of murder and kidnaping. Complaint, ¶ 15; *see* Case No. 08 MC 97. The magistrate judge granted the extradition request on the charge of use of a false document, but in August 2010, the United States moved to dismiss that request, and Nolan was released from custody on August 6, 2010. *Id.*

**II.     Nolan's Complaint**

In March 2011, Nolan filed this action in district court, seeking damages personally from ten named officials for alleged violations of the Fifth Amendment and the United Nations Convention Against Torture. The complaint alleges that as a result of being in administrative detention, Nolan was confined in a windowless cell for 23 hours a day and "denied newspapers, magazines, or any other method of keeping track of the time of the day and day of the week." Complaint, ¶ 18. He was not permitted more than occasional access to the telephone or e-mail and for the first several months of his confinement was not allowed to have visitors other than his lawyer. *Id.*, ¶ 19. Thereafter he was not permitted "regular" contact visits with his wife and "virtually no" contact visits with his children and others, again excepting his lawyers. *Id.* After September 18, 2009, Nolan was permitted only one contact visit per week with his wife and not permitted "regular" contact visits with his children. *Id.*, ¶ 30. For one hour a day he was allowed out of his cell to bathe and exercise, but only by himself. *Id.,* ¶ 20. Nolan also alleges he received

inadequate medical care and that he suffered a staph infection; an actinic keratosis lesion on his chest; skin lesions on his arm and shoulder; several skin disorders, including rashes, a swollen knee, leg abrasion, and bleeding ankles; anxiety, depression, attention deficit disorder and post-traumatic stress disorder; and psychological and psychiatric effects of extended solitary confinement. *Id., ¶* 28. Nolan asserts on "information and belief" that the BOP failed to monitor him for the psychological effects of solitary confinement. *Id.*, ¶ 26.

Nolan further claims that he did not receive mail, mail was delayed, and mail was "tampered with." *Id.*, ¶ 29. And that he was not permitted to communicate with his father before his father died, even after officials had received information that Nolan's father was on his deathbed. *Id.*, ¶¶ 31, 40. Nolan's ability to bathe, exercise, go to the law library and otherwise move about within the institution was severely limited by a requirement that three officers be involved in any movement (a condition referred to as a "three man hold"). *Id.*, ¶¶ 32, 35. Nolan alleges he was not consistently allowed daily recreation and exercise, never permitted outdoor recreation, and his access to commissary was restricted. *Id., ¶¶* 32-33. Nolan was not permitted to wear his wedding ring. *Id.*, ¶ 34. Nolan's cell was not properly cleaned, and an inmate in a neighboring cell covered the walls of his cell (the neighbor's cell, not Nolan's) in excrement. *Id.*, ¶¶ 38, 41. Finally, Nolan alleges that defendant Robert Johnson made inappropriate sexual comments to him and watched him undress, behavior that Nolan characterizes as sexual harassment. *Id.*, ¶ 38.

As to the involvement of individual defendants, Nolan alleges that Lt. Collins and Officer Shivers signed the order placing him in administrative detention. *Id.*, ¶ 21. Warden Thomas and Regional Director Nalley denied grievances in which Nolan asked to be placed in general population and to have the "three man hold" removed." *Id.* Nolan further alleges it was Warden Thomas's

responsibility to "ensure that Mr. Nolan was provided with competent care," and that it was "widely known" that MCC medical director Dr. Paul Harvey did not provide adequate care. *Id.*, ¶ 39. Finally, Nolan generally alleges that his "conditions of confinement were the responsibility of Warden Thomas, Captain Salas, Unit Manager Schnake and other defendants." *Id.*, ¶ 41.

### Discussion

### I. Legal Standard for Rule 12(b)(6) Motion

A complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief" and "fair notice" of the plaintiff's claims and the basis for those claims. Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *Twombly* added considerable bite to Rule 12(b)(6) pleading standards by confirming that a plaintiff's complaint must render his "entitlement to relief plausible." *Id.* at 569, n.14. In defining what it meant by "plausibility" in the notice-pleading context, *Twombly* disavowed any broad reading of the Court's earlier statement in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that a complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly* stated that "this famous observation has earned its retirement," because it left open the possibility that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 550 U.S. at 561, 563. Instead, the Court held, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), the Supreme Court forcefully applied the *Twombly* pleading standard in the context of a claimed constitutional violation. The court explained

that *Twombly* established two principles. First, a court is not required to accept as true conclusory statements or legal conclusions couched as factual allegations. *Id.* at 1949-1950. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 1949. Second, the court must "draw on its judicial experience and common sense" to determine "whether a complaint states a plausible claim for relief." *Id.* at 1950.

## II. The Complaint Fails to State a Claim.

Nolan's complaint fails to meet the standard of plausibility. At the outset, Nolan's complaint is remarkable for its failure to give any hint of the security concerns that led the BOP to impose the challenged confinement conditions. Fortunately, some of the factual basis for those security concerns is set out in the grievance documents referenced in the complaint (¶ 21) and the plea agreement, where Nolan acknowledged plotting to *escape* from the MCC. This court may take judicial notice of the plea agreement. *See General Elec. Capital Corp. v. Lease Resolution*, 128 F.3d 1074, 1081 (7th Cir. 1997) ("The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records."). And the court may also consider the grievance documents. *See Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (materials considered part of pleadings if referenced in complaint and central to claim). These materials (Exhibits 1-3) facilitate a recognition that the complaint fails to state a "plausible" claim under the standards set by the Supreme Court in *Twombly* and *Iqbal*.

Nolan's complaint suffers from two fundamental defects: First, the alleged conditions of confinement do not violate the Constitution or any statute. Much less do they constitute a violation of clearly established law sufficient to overcome the defense of qualified immunity. Second, for the most part, the complaint does not plead facts to establish personal involvement of the named

6

defendants. If the court should find that one or more of the conditions of confinement alleged in the complaint states a violation of clearly established law — a proposition we contest — the court would then be required to consider which — if any — of the named defendants personally caused the alleged violation. The determination of personal involvement would be based on the plausible inferences to be drawn from the factual allegations of the complaint. Each defendant would be entitled to individual consideration.

### A. The Complaint Does Not Allege a Constitutional or Statutory Violation.

Nolan bases his complaint on the Fifth Amendment due process clause and on the Convention Against Torture. Each claim is addressed below.

#### 1. Due Process

In evaluating the constitutionality of conditions or restrictions of pretrial detention under the due process clause, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Nolan does not dispute the legitimacy of the decision to detain him — and the individual defendants in this case were in any event not involved in that decision. "Loss of freedom of choice and privacy are inherent incidents of confinement . . . ." *Id.* at 537. As long as a condition of confinement is "reasonably related to a legitimate goal" as opposed to being "arbitrary or purposeless," it is not punishment. *Id.* at 539. In considering whether a specific practice or policy is "reasonably related" to security interests, courts should play a very limited role, since such considerations are peculiarly within the province and professional expertise of corrections officials. *Id.* at 540-541.

Nolan challenges the decision to place him in administrative detention and the various restrictions on his liberty that accompanied that decision. But it was rational for the MCC to

7

conclude that Nolan posed a security risk due to his military training, his braiding of ropes and a climbing harness, his secreting a lock pick and a razor blade in his cell, and additionally his plotting escape with another inmate. *Bell*, 411 U.S. at 540 ("Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting ."); 28 C.F.R. § 541.22 (stating inmate may be placed in administrative detention to preserve security of the institution). The conditions of which Nolan complains were attendant to his placement in administrative detention and rationally related to the institution's legitimate interest in preserving jail security. Nolan complains that the decision to place him in administrative detention (1) resulted in interference with his right to receive mail, (2) caused severe restrictions on visitation with his wife and children, (3) deprived him of his ability to communicate with his dying father, (4) deprived him of his right to wear his wedding band, (5) interfered with his access to adequate medical care, (6) restricted his access to exercise, fresh air, commissary, and opportunities to bathe, (7) caused him to live for extended periods of time in an area that had not been properly cleaned, (8) interfered with his access to the courts, and (9) interfered with his right to be free from sexual and other forms of harassment. Complaint, ¶ 38. These claims are addressed in turn, below.

First, it did not violate due process for the MCC to open and review Nolan's mail. *United States v. Whalen*, 940 F.2d 1027, 1035 (7th Cir., 1991) (no legitimate expectation of privacy regarding prison mail); 28 C.F.R. § 540.12 ( stating BOP staff have authority to open all mail). Second, contact visits invite a host of security problems, and the Supreme Court has found that a blanket prohibition on contact visits is an entirely reasonable, nonpunitive response to legitimate security concerns. *Block v. Rutherford*, 468 U.S. 576 (1984); 28 C.F.R. § 540.40 (stating visitation

8

may be restricted to preserve security and good order). And Nolan admits that he was frequently *permitted* contact visits with his wife and children. Complaint, ¶ 30. Third, Nolan's claim that he was not allowed to call his father does not state a claim. The Seventh Circuit held in *Lekas v. Briley*, 405 F.3d 602, 610-611 (7th Cir. 2005) that an inmate does not have a recognizable liberty interest in maintaining telephone privileges. *See* 28 C.F.R. § 540.100 (stating telephone privileges may be limited to ensure security or good order). Fourth, Nolan did not have a constitutional right to wear a wedding ring. An individual's right to possess personal property is severely diminished upon imprisonment, and there is no constitutional right prohibiting prison officials from confiscating most of a prisoner's personal property pending release from prison. *Secret v. Brierton*, 584 F.2d 823, 830 (7th Cir. 1978); *see also, Thornburgh v. Abbott*, 490 U.S. 401, 416 (1989) (holding that prison authorities have broad discretion in regulating entry of material into a prison).

Fifth, Nolan's complaints about his medical care are misdirected. Deliberate indifference to serious medical needs can violate due process (though negligence, even gross negligence does not). *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003). A deliberate indifference claim contains both objective and subjective elements. A plaintiff must show (1) harm that is "objectively, sufficiently serious and a substantial risk to his health or safety;" and (2) that "each individual defendant subjectively knew" of the threatened harm *"and* that each individual defendant intentionally disregarded that risk." *Matos*, 335 F.3d at 557 (emphasis in original). Nolan's complaint merely lists ailments that he allegedly suffered at the MCC. That list may not satisfy even the first element, *i.e.*, objective identification of a serious and substantial risk to his health or safety. But supposing it does, Nolan still does not allege facts to support a plausible claim that any *named* defendant was subjectively aware of and

intentionally disregarded a serious and substantial risk to his health or safety. Nolan acknowledges he was under the care of a medical doctor, Dr. Paul Harvey, who is not among the named defendants. Nolan's conclusory allegation that it was "widely-known" that Dr. Harvey was incompetent is not sufficient to state a plausible claim against any of the defendants that he does name. *See Hayes v. Snyder*, 541 F.3d 516, 527 (7th Cir. 2008) ("non-medical defendants were entitled to rely on the professional judgment of medical prison officials").

Sixth, restrictions on a prisoner's movements and recreation and commissary privileges are also rationally related to institutional security. "Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (claim stated where prisoner was denied *all* exercise for periods of seven weeks at a time). But Nolan's complaint acknowledges that he *was* provided with *daily* opportunities for exercise. And restrictions on commissary privileges are not unconstitutional; Nolan did not have a protected liberty interest in visiting the commissary. *Campbell v. Miller*, 787 F.2d 217, 222 (7th Cir.); *Ward v. Oliver*, Case No. 91 C 1468, 1992 WL 211055, *2 (N.D. Ill. Aug 27, 1992). Seventh, the Constitution does not mandate comfortable prisons. Unsanitary, "subhuman conditions" may violate the Constitution based on the same two-part test that applies to other claims alleging deliberate indifference to serious health risks. *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). Nolan's allegations regarding sanitation do not rise to the level of stating a subhuman conditions claim.

Eighth, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 823 (1977). But to sustain a claim that this right was violated, a prisoner must demonstrate actual injury by showing that he was hindered in his efforts to assist in a pending

criminal case or to pursue a non-frivolous legal claim to vindicate basic constitutional or civil rights. *See Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Howland v. Kilquist*, 833 F.2d 639, 641-642 (7th Cir. 1987) (claim for denial of access to the courts requires showing that access to the courts was actually impeded). Nolan acknowledges that he was permitted contact with counsel and does not allege any actual injury.

Finally, ninth, Nolan's allegation that a male staff member watched him undress and made inappropriate sexual comments does not rise to the level of a constitutional violation. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (correctional officer's racially derogatory and sexually explicit remarks did not give rise to constitutional claims); *Daniels v. Southfort*, 6 F.3d 482, 484 (7th Cir.1993) (threatening verbal statements by police officers do not present constitutional concerns); *Johnson v. Phelan*, 69 F.3d 144, 147 (7th Cir. 1995) (noting that prisoners dress, undress, and bathe under watchful eyes, and finding no constitutional violation even if the monitoring is done by a member of the opposite sex) (the staff member named here is the same sex as Nolan).

### 2. Convention Against Torture

Nolan invokes the United Nations Convention Against Torture ("CAT"). But the CAT is not self-executing and does not create a private right of action. *See* 136 Cong. Rec. S17486-01 (daily ed. Oct. 27, 1990) (statement of Sen. Terry Sanford), 1990 WL 168442 (Oct. 27, 1990) (rendering the advice and consent of the Senate in ratifying CAT subject to the declaration that "the provisions of Articles 1 through 16 of the Convention are not self-executing"); *Mu-Xing Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003); *Calderon v. Reno*, 39 F. Supp.2d 943, 957 (N.D. Ill, 1998). Moreover, *Bivens* has never been extended to claims based not on the Constitution, but on *treaties*, as far as we know. *Bivens* is not "a gap-filler, available whenever a plaintiff seeks a remedy

not provided for by any statute or regulation . . . ." *Robinson v. Sherrod*, 631 F.3d 839, 842 (7th Cir. 2011 ("*Bivens* is under a cloud"). Accordingly, Nolan cannot bring a claim under the CAT.

### B. Personal Participation

The second fundamental defect in Nolan's complaint is that it does not allege personal participation of the named defendants. Nolan has named ten individual defendants, but he does not allege facts to tie individual defendants to specific allegations of the complaint. Many of the named defendants are not even mentioned outside of the caption.

An individual public servant cannot be held personally liable unless he, himself, "caused or participated in an alleged constitutional deprivation." *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986). A plaintiff cannot rely upon general, conclusory allegations of wrongdoing, but must instead "allege facts which show that the individual defendant was personally involved in the deprivation of the plaintiff's constitutional rights." *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997). *Respondeat superior* is not applicable. *Iqbal*, 129 S.Ct. at 1948; *Doyle v. Camelot Care Ctrs. Inc.,* 305 F.3d 603, 614-615 (7th Cir. 2002) ("plaintiff only may bring a [constitutional] claim against those individuals personally responsible for the constitutional deprivation").

*Crowder v. Lash*, 687 F.2d 996 (7th Cir. 1982), holds that a superior official does not become personally responsible for the actions of subordinates merely by receiving a complaint about their conduct, noting the logical import of such a theory would be to hold "any well informed [superior official] personally liable for damages flowing from any constitutional violation occurring at any jail within that [official's] jurisdiction." *Id.* at 1005. *See also, Soderbeck v. Burnett County, Wisconsin,* 752 F.2d 285 (7th Cir. 1985) (holding failure to take corrective action does not establish a constitutional violation, because otherwise, the action of an inferior officer would automatically

12

be attributed up the line); *Joyner v. Snyder*, No. 06-3062, 2007 WL 3253390, *3 (C.D. Ill., Nov. 2, 2007); ("Simply sending a prison director a grievance complaining of the actions or conduct of subordinates does not establish the director's personal involvement."); *Jones-Bey v. Wright*, No. 3:93-cv-888RM, 1996 WL 476661, *4 (N.D. Ind. August 19, 1996) ("It is well-established that a correctional official cannot be subjected to liability under § 1983 merely by being the recipient of grievances or by failing to respond to inmate grievances."); *Crawford v. Roth*, No. 91 C 2400, 1994 WL 96659, *3, (N.D. Ill. Mar. 22, 1994) (warden's failure to respond to inmate's letter apprising warden of misconduct by subordinates insufficient to subject warden to personal liability). Should the court find that the complaint states a claim on some point, it must give individual consideration to each defendant and determine whether the complaint plausibly alleges personal participation.

### C.     Qualified Immunity

Defendants assert the defense of qualified immunity, which protects them against suit unless their conduct violates "clearly established" constitutional rights about which any reasonable person would have known at the time of the events in question. *Wilson v. Layne*, 526 U.S. 603, 609-10 (1999); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This rule ensures that government officials will not be held personally liable except for conduct that *plainly* violates a statute or the Constitution. Qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted).

The qualified immunity issue entails the two-step inquiry set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), though the court is not rigidly bound to follow the two steps in sequence. *Pearson v. Callahan*, 129 S.Ct. 808 (2009). First, plaintiff must allege facts that show that the officer's

conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. If not, "there is no necessity for further inquiries concerning qualified immunity." *Id.* Second, if the plaintiff's allegations make out a constitutional violation, the court must consider whether the right alleged to be violated was clearly established. *Id.* "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Id.*

As the Supreme Court has noted, the operation of the qualified immunity standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Plaintiffs are not to be permitted "to convert the rule of qualified immunity that [Supreme Court] cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* Instead, the plaintiff must show that the infringed right was clearly established in a "particularized, and hence more relevant sense," so that a reasonable official in the position of the defendant "would understand that what he is doing violates that right" at the time of the alleged action. *Id*. at 640.

The Supreme Court's precedents make clear that the "defense is meant to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such *pretrial* matters as discovery, as inquiries of this kind can be peculiarly disruptive of effective government." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (emphasis in original; internal quotation marks and ellipses omitted). Qualified immunity thus is an immunity from the entirety of the litigation process, including discovery and trial, rather than merely a defense to liability. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (citing *Harlow,* 457 U.S. at 817-19). The Supreme Court has "repeatedly stressed" that courts should apply qualified immunity "at the earliest possible stage of litigation." *Saucier,* 533 U.S. at 201 (quoting *Hunter*, 502 U.S. at 227). Suits for money damages against public officials

14

"frequently run against the innocent as well as the guilty — at a cost not only to the defendant officials, but to society as a whole." *Harlow*, 457 U.S. at 814. As our court of appeals has explained, "qualified immunity gives the defendant a right not only to prevail but also to avoid entanglement in the litigation," and to "avoid discovery if matters are sufficiently clear at the outset of the suit." *Fairley v. Fermaint*, 482 F.3d 897, 900 (7th Cir. 2007). *See also, Mitchell*, 472 U.S. at 526 ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery"); *Harlow*, 457 U.S. at 818 ("Until this threshold immunity question is resolved, discovery should not be allowed"). In response to this motion, the burden is on Nolan to cite authority to show that actions taken by each individual defendant violated clearly established law that would be known to any reasonable officer.

### Conclusion

For the foregoing reasons, this court should dismiss plaintiff's complaint.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: s/ Jonathan Haile
   JONATHAN C. HAILE
   Assistant United States Attorney
   219 South Dearborn Street
   Chicago, Illinois  60604
   (312) 886-2055
   jonathan.haile@usdoj.gov