**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Matthew Nolan,<br><br>    Plaintiff,<br><br>    v.<br><br>LINDA THOMAS, Warden,<br>JANET PURDUE, Assistant Warden,<br>JAMES HENRY, Assistant Warden,<br>ANTONIO SALAS, Captain,<br>WILLIAM SCHNAKE, Unit Manager,<br>MICHAEL REUSCH, Lieutenant,<br>WANDA COLLINS, Lieutenant,<br>KIM SHIVERS, Correctional Officer,<br>ROBERT JOHNSON, BOP Staff,<br>MICHAEL NALLEY, BOP Regional Director,<br><br>    Defendants. | No. 11 CV 1565<br>Judge James B. Zagel |

## **MEMORANDUM OPINION AND ORDER**

In a *Bivens* action, Plaintiff Matthew Nolan ("Nolan" or "Plaintiff") alleges constitutional deprivation suffered at the hands of certain officials of the Metropolitan Correctional Center in Chicago, Illinois.[1][2] Defendants move to dismiss under Rule 12(b)(6) and, in the alternative, plead the defense of qualified immunity. For the reasons discussed below, I find that the officials are immune from a claim of a denial of procedural due process and that the due process claim

---

[1] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), recognized an implied right of action against officers of the federal government for alleged Constitutional violations.

[2] Plaintiff also mentioned the United Nations Conventions Against Torture in the complaint, but when Defendants challenged that as a claim in their motion to dismiss, Plaintiff offered no further development of the claim or argument against its dismissal. To the extent Plaintiff asserted such a claim, therefore, I deem it abandoned and dismiss it with prejudice.

rooted in the conditions of confinement is defeated by facts alleged and referenced in public records. A claim alleging deliberate indifference to serious medical needs, however, remains as to Defendants Thomas, Purdue, Henry, Reusch, and Salas.

I. BACKGROUND

A. Facts Drawn from Plaintiff's Complaint

Plaintiff was detained by federal authorities on or about February 26, 2009 and placed in the Chicago Metropolitan Correctional Center ("MCC"). He was held in administrative detention on the basis of an extradition warrant issued by the government of the nation of Costa Rica.

The warrant alleged aggravated kidnaping, murder, and use of a false document. On August 31, 2009, a Magistrate judge determined that no probable cause existed for the kidnaping and murder charges, and therefore denied a petition to extradite on the basis of those charges. The magistrate did grant the request on the basis of the document charge, but the United States ultimately moved to have that charge dismissed. Nolan was eventually released from administrative detention on August 6, 2010.

While detained in the MCC, an indictment issued against Nolan, charging him with four counts of possessing prohibited objects while in federal custody and one count of obstruction of justice. Nolan was denied bail on the charges and, therefore, from October 20, 2009 to July 7, 2010, Nolan's official status was that of a pretrial detainee.

For the duration of Nolan's detention in the MCC, he claims he was placed in solitary confinement. He was allegedly confined in a single windowless cell with a door that was solid save a small window at eye level and a ground-level opening (known as a "chuck-hole") used for

handcuffing and meal delivery. The cell had a steel bench, as well as a toilet and sink. Nolan was kept in this cell twenty-three hours per day and was denied newspapers, magazines, or other ways of keeping track of dates. Guards controlled the lighting. For the one out-of-cell hour Nolan was allegedly permitted, he could bathe or go to another cell, called "the cage," in which he could exercise.

Nolan was allegedly prohibited from interacting with other detainees and was permitted only occasional access to a telephone and email. For the "first several months" of his detention, he did not see anyone beyond his lawyer. In the first six and one-half months, he had only one contact visit with his wife. In Nolan's exact words, "[d]uring the entire seventeen month course of solitary confinement he was not permitted regular contact visits with his wife and virtually no contact visits with his children or others who were not legal counsel."

When moving outside of his cell, Nolan was allegedly subject to a special precaution known as a "three-man hold." This meant that a trio of guards was required to accompany him for every out-of-cell movement.

Plaintiff alleges that solitary confinement can cause "severe psychological harm." Nolan claims he, in fact, did suffer such harm and has thus been diagnosed with mental conditions stemming from his confinement. Nolan claims that his confinement either caused or worsened conditions such as anxiety, depression, attention deficit disorder, and post-traumatic stress disorder. Nolan claims that these harms were exacerbated by the fact that he was not properly monitored for the psychological effects of his solitary confinement, as is allegedly required under Federal Bureau of Prisons regulations.

Nolan also claims that he suffered physical harm. Among other things, Nolan claims to have suffered from a bacterial infection (staphylococcus aureus, or "staph") and obstruction in his ear, a regrowth of a lesion in the middle of his chest, along with skin lesions and assorted skin disorders. Nolan claims that irregular and inadequate medical examinations were the chief cause of his physical ills. Plaintiff argues that Dr. Paul Harvey, the MCC doctor and a non-party here, was inattentive to Nolan. Further Plaintiff alleges that it was "widely known" that Dr. Harvey provided inadequate care.

Nolan also alleges certain miscellaneous harms, including interference with his right to receive mail, interference with his access to a law library, inability to wear his wedding band, and suffering sexually harassing comments. Additionally, Plaintiff alleges that prison officials were callous in not allowing him to speak with his father, who was terminally ill.

B. Additional Facts Drawn from Outside the Complaint[3]

Upon his arrival at the MCC in February, 2009, Plaintiff was placed in the Special Housing Unit ("SHU") of the MCC. Writing in response to Plaintiff's request for Administrative Remedy Request on February 2, 2010, Defendant Linda Thomas, the MCC warden, explained that the initial decision was for the purpose of greater security. That determination was based on several factors including, among other things, Plaintiff's having served in a "specialized regiment within the British Army" that taught him "unique military training and skills."

---

[3]The first such source includes Plaintiff's plea agreement that resulted from the indictment referenced in Plaintiff's complaint. Additional sources include the grievance documents and BOP officials' responses. *See Palay v. United States*, 349 F.3d 418, 425 n. 5 ("[I]n resolving a motion to dismiss, the district court is entitled to take judicial notice of matters in the public record.")

Warden Thomas went on to explain that the extra security measures remained necessary because of later conduct of Plaintiff. As referred to generally in her Administrative Remedy Request and as detailed in Plaintiff's plea agreement, between Plaintiff's arrival on February 26, 2009 and March 11, 2009, Plaintiff made or acquired several items to facilitate an escape from the MCC. For instance, Plaintiff braided thirty-one feet of rope and a climbing harness out of bedding materials supplied by the MCC. Plaintiff concealed those items in a mattress in his cell, along with a metal clip capable of opening handcuffs. He further concealed a razor blade inside a bar of soap.

If there was any doubt as to what these materials were for, on March 7, 2009, Plaintiff detailed in a note to an individual referred to as "Individual B" in the indictment the following: "[m]y thought was tape the window, crack, mount rope w/ rope sleeve and rope bag . . . rappel to street + friends . . . Trigger man runs the op from parking garage." Plaintiff added, referring to the materials he would later acquire: "I do need tools, razors and sheets if you have them." These facts, and others, formed the basis of Plaintiff's pleading guilty to charges of possession of contraband in a federal prison in violation of 18 U.S.C. 1791(a)(2).

In addition to the prohibited items and escape planning, Plaintiff was communicating to another individual, "Individual A," about destroying certain materials in his home related to the case for which he was originally detained. Specifically, he placed a phone call to Individual A in which Plaintiff and Individual A discussed the contents of a safe. During an FBI search of Plaintiff's home on February 26, 2009, the FBI had been unable to access Plaintiff's personal safe. Individual A relayed to Plaintiff that she had told the FBI that she did not have the combination to the safe and that it had not been used in two years. Plaintiff replied "Good " and

"thank God." He then later explained that certain contents of the safe "should go bye-bye." When the FBI returned to the home on March 19, 2009, the FBI searched the safe, and it had been emptied. Based on these facts and others, Plaintiff was indicted and pled guilty to obstruction of justice charges.

Plaintiff sought relief for his confinement conditions, and in particular the "three-man hold" condition, via the Bureau of Prisons grievance process. His request was received on January 5, 2010. As mentioned above, Defendant Warden Thomas denied Plaintiff's request on February 12, 2010. Defendant Michael Nalley, the regional director for the BOP, denied Plaintiff's March 15, 2010 appeal on April 20, 2010.

C. The Named Defendants' Alleged Conduct

The specific alleged conduct of each Defendant is as follows:

 - Linda Thomas, the warden of the MCC, signed the denial of Nolan's grievance petitions seeking relief from solitary confinement and the three-man hold. Viewed in the light most favorable to Plaintiff, Thomas knew that Dr. Harvey provided substandard medical care.

 - Wanda Collins, a lieutenant, is claimed to have signed the order placing Nolan in administrative detention.

 - Kim Shivers, a correctional officer, is claimed to have signed the order placing Nolan in administrative detention.

 - Robert Johnson, BOP Staff, allegedly made sexually inappropriate comments to Nolan and tampered with his mail.

 - Michael Nalley, BOP Regional Director, signed the denial of Nolan's grievance petitions seeking relief from solitary confinement and the three-man hold.

- Viewed in the light most favorable to Plaintiff, the remaining Defendants - Janet Purdue, the assistant warden, James Henry, another assistant warden, Antonio Salas, a captain, William Schnake, a unit manager, and Michael Reusch, a lieutenant - are alleged to generally be responsible for the conditions of Nolan's confinement.

## II. STANDARD OF REVIEW

Defendants have moved to dismiss Plaintiff's complaint, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. In order to survive such a motion, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In considering a motion to dismiss for failure to state claim, the court treats all well-pleaded allegations as true, and draws all reasonable inferences in plaintiff's favor. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009). The issue in ruling on dismissal is adequacy of the complaint not whether a claim is meritorious. Therefore, while detailed factual allegations are not required, a plaintiff has an obligation to provide "enough facts to state a claim to relief that is plausible on its face" and that "raises a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 555 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). It is possible for Plaintiff to "plead [him]self out of court" by pleading facts that show that he has no legal claim. *Atkins v. City of Chicago,* 631 F.3d 823, 832 (7th Cir. 2011) (collecting cases).

Defendants also assert a defense of qualified immunity as to certain claims. The relevant standard and contours of that defense are discussed below.

III. ANALYSIS

A. Procedural Due Process

To the extent Plaintiff has alleged a procedural due process violation, Defendants are entitled to qualified immunity.

The doctrine of qualified immunity insulates government actors from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. *Siliven v. Ind. Dep't of Child Servs*, 635 F.3d 921, 925-26 (7th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). "In other words, the doctrine protects public officials who act in ways they reasonably believe to be lawful, and thus leaves ample room for mistaken judgments." *Id.* (citations omitted).

Qualified immunity claims present two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 231. Courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Once a defense of qualified immunity is offered, it becomes the Plaintiff's burden to make out the Constitutional deprivation and that such right was clearly established. *Lewis v. Downey*, 581 F.3d 467 (7th Cir. 2009). To defeat a defense of qualified immunity, the right the injured asserts must be clearly established "in a particularized sense." *Lewis v. Downey*, 581 F.3d 467, 478-79 (7th Cir. 2009).

The self-described "gravamen of [P]laintiff's complaint" is that he was kept in solitary confinement for seventeen months "without meaningful on-going assessment of the effects of solitary confinement on him." Plaintiff then cites *Marion v. Columbia Correctional Institute* as the basis for his complaint.

*Marion* is a procedural due process case. In *Marion*, the Seventh Circuit advised that a prison inmate may establish the requisite liberty interest if the length of an administrative segregation term is sufficiently long and the conditions sufficiently harsh. 559 F.3d 693, 697-98 (7th Cir. 2009). Further, in cases where the duration of confinement approaches or exceeds one year, a liberty interest may arise with no reference to the harshness of conditions. *Id.* at 699. Plaintiff here alleges confinement well over one year, so his allegations likely establish the requisite liberty interest.

Once a liberty interest is established, however, Plaintiff must then establish that whatever process he was given was Constitutionally deficient. Where, as here, administrative segregation is at issue, the Supreme Court has explained that only "informal, nonadversary procedures" are required. *Wilkinson v. Austin*, 545 U.S. 209, 229 (2005). Therefore, to prove up his procedural due process claim, Plaintiff must establish that one or more of the Defendants deprived him of even the "informal, nonadversary procedures" referenced in *Wilkinson.*

It is at this point that Defendants' claims of qualified immunity are implicated. Only violations of "clearly established" law remove the shield of qualified immunity. *Pearson*, 555 U.S. at 231. Here, in Plaintiff's own allegations and in records properly considered as referenced in the complaint, Plaintiff admits that he challenged his conditions via the Federal Bureau of Prisons Administrative Remedies protocol. *See* 28 C.F.R. 542 *et seq.* Plaintiff now maintains

9

that this protocol is constitutionally deficient as a matter of procedural due process. Even if Plaintiff were able to establish this sweeping claim, however, he has not cited any authority to suggest that these procedures had been declared unconstitutional at the time the Defendants employed them. Plaintiff has not met his burden in showing that he was deprived of right that was "clearly established." Therefore, Defendants are immune from a procedural due process claim.

B. Conditions of Confinement

Plaintiff further alleges a due process violation connected to the conditions of his confinement. A pretrial detainee may not be subject to any punishment without due process of law under the Fifth Amendment. *See Board v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). When a pretrial detainee alleges due process violations rooted in the conditions of his confinement, "courts must determine whether the conditions of confinement are imposed with an intent to punish or only pursuant to a legitimate administrative purpose." *Zarnes v. Rhodes*, 64 F.3d 285, 291 (7th Cir. 1995) (citing *Bell*, 441 U.S. 538). To succeed on a due process claim tied to confinement conditions, a pretrial detainee thus has to demonstrate either (1) an "expressed intent to punish on the part of detention facility officials," (2) that the challenged conditions or restrictions lacked a rational relationship to a legitimate, non-punitive administrative purpose, or (3) that a restriction is excessive in light of that purpose. *Bell*, 441 U.S. at 538 - 39.

Here, no punitive intent is alleged and none can be inferred from the prison officials' responses to Plaintiff's grievances. Additionally, every condition imposed on Plaintiff was reasonable in light of the facts he himself admitted to in his plea agreement. Plaintiff secreted numerous objects with the express intent of attempting an escape from the MCC. In light of this,

10

the three-man hold and segregated confinement conditions were entirely appropriate. Plaintiff's reduced access to other inmates and to his family were reasonable in light of the same and in light of his abuses of his communication privileges. These abuses, of course, came in the form of Plaintiff plotting an escape and coordinating the destruction of the safe contents on his behalf, resulting in an obstruction of justice conviction.

C. Deliberate Indifference to Serious Medical Needs

Plaintiff's due process claim on the conditions of his confinement are also alleged on the grounds that such conditions constituted deliberate indifference to his medical needs. "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)).[4] Such a claim comprises an objective and subjective component. *Id.* The medical need must be objectively a serious one. *Id.* Subjectively, the individual defendant must, at a minimum, know of and disregard a substantial risk to health. *Id.*

There can be no dispute that, at a minimum, a staphylococcus infection can develop into a serious medical problem. Viewed in the light most favorable to Plaintiff, other ailments he described are sufficiently serious at the pleading stage.

As for the subjective state of mind, Defendants are all non-medical prison officials. They therefore cite *Hayes* for the proposition "non-medical defendants [a]re entitled to rely on the

---

[4]While the right that protects a pretrial federal detainee is found in the Fifth Amendment, the protections of the Eighth Amendment are a sort of bare-minimum applied in claims such as deliberate indifference. *See Board*, 394 F.3d at 477 ("Although the Eighth Amendment does not apply to pre-trial detainees, pretrial detainees are entitled to *at least* as much protection as the constitution provides convicted prisoners.").

11

professional judgment of prison officials." *Id.* at 527. But in that case, the Seventh Circuit was not quite as unequivocal as Defendants suggest. What the court said in *Hayes* was that if a prisoner is under the care of medical experts "a non-medical prison official will *generally* be justified in believing that the prisoner is in capable hands." *Id.* (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)) (emphasis added). The court added that non-medical officials are "chargeable with the Eighth Amendment scienter requirement of deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* (quotations omitted).

Here, Plaintiff's complaint alleges that, at a minimum, Warden Thomas had several reasons to know that the non-party medical officer, Dr. Paul Harvey, was providing substandard care. In additional briefing, which I consider here in my discretion, Plaintiff adds factual detail by stating that Assistant Wardens Purdue and Henry, Lieutenant Reusch, and Captain Salas also knew that Dr. Harvey was not providing adequate care. At the pleading stage, Plaintiff has stated enough to put these Defendants on notice as to a deliberate indifference claim.

IV. CONCLUSION

For the foregoing reasons, all Defendants are entitled to qualified immunity on the claim of denial of procedural due process related to the decision to place and retain Plaintiff in the Special Housing Unit. Facts of which I have taken judicial notice demonstrate that Plaintiff cannot succeed on the Fifth Amendment claim related to the overall conditions of confinement. Judgment is therefore to be entered in favor of all Defendants on these claims.

As to the claim of deliberate indifference to medical needs, Plaintiff has stated a claim against Defendants Thomas, Purdue, Henry, Reusch, and Salas. The motion to dismiss as to

these Defendants is, therefore, DENIED. As to Defendants Collins, Shivers, Johnson, Nalley, and Schnake, the motion to dismiss is GRANTED.

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: October 19, 2011